## WILLIAM SCOTT *v.* THE STATE.

1. DRUNKENNESS — CHARGE OF THE COURT.— In a trial for assault with intent to rob, the court instructed the jury as follows: "Voluntary drunkenness furnishes no excuse or justification for crime. However, if you find that defendant did make the assault as charged in the indictment, and if you find that when he so made said assault he was so drunk that he did not know what he was doing, and was unable to form the criminal intent necessary to commit the crime charged, you will acquit him. But any amount of voluntary drunkenness which does not reach the *status* above indicated would not furnish any excuse or justification for the commission of it." *Held,* that this instruction, taken as a whole, is a correct exposition of the legal principles within its purview.

2. SAME.— No appellate court of this State has ever held that voluntary drunkenness could excuse or justify crime.

3. SAME.— EVIDENCE that the accused was drunk when he committed the act imputed to him is admissible for no other purpose than its bearing upon the question of a criminal intent.

APPEAL from the District Court of Dallas. Tried below before the Hon. GEORGE N. ALDRICH.

The indictment charged that the appellant, on June 5, 1881, made an assault and battery on E. A. Forrester, with the intent, by putting said Forrester in fear of his life and bodily injury, to take from his person and possession his money, goods and personal property, without his consent, and with intent to deprive him of their value, and to appropriate the same to the use and benefit of him, the appellant; contrary, etc. The jury found appellant guilty as charged in the indictment, and assessed his punishment at a term of two years in the penitentiary.

E. A. Forrester, for the State, testified that he was a railroad laborer, and, in the night of June 5, 1881, he came to the city of Dallas and accompanied his brother to Thompson's theatre, whence they went to the "Red-Light," a bagnio. Witness remained until after his brother left, and then started to the wagon-yard where

they were staying. As he started he saw the defendant and one O'Brien come out of the "Red-Light," and they followed him as he proceeded. He got opposite a livery stable on one of the side streets when one of them asked him what time of night it was; to which he replied that he heard a man at the depot say it was nearly three o'clock. While stopping to tell them this, they got close to witness, and the defendant grabbed him by the throat and threw him down, and O'Brien jumped on his breast. One of them said to the other, "go through him," and the other put his hand in witness's pockets. Witness was all the time struggling and calling for help, and while doing so O'Brien said to him, "Keep quiet and give up your money, or I will cut your d—d heart out." Witness had a five-dollar bill in the left pocket of his pants, but they did not get their hands into that pocket. As soon as they got through with witness they ran off down the street, and he went across to where McDonald, a hackman, was standing, and asked him why he did not come and help him, the witness. McDonald replied to the effect that he was afraid to leave his team. Witness went and reported the affair to the police, and the next morning he was taken to the calaboose, and there saw the defendant and O'Brien, and recognized them as the men who had assaulted and tried to rob him.

On cross-examination the witness said that he could not see that either the defendant or O'Brien was drinking when they assaulted him; but the next morning, at the calaboose, the defendant seemed so drunk that the officer could not wake him up. Witness had never seen either the defendant or O'Brien previous to the night of the assault, nor did he know their voices. McDonald, the hackman, was standing within a hundred feet, and could see the whole affray. Witness denied that he told Marshal Morton, at the calaboose, that O'Brien attacked him first, and that he struck O'Brien and knocked him

loose and down. Witness did strike one of the men as they were about leaving him, but did not remember telling Morton so. They seemed to leave him of their own accord; no one compelled them to do so. The five dollars were all the money the witness had at the time, and he did not remember showing it that night. He was dressed that night in his rough working clothes, and did not remember whether the moon was shining at the time of the assault or not.

J. McDonald, for the State, testified that he was standing before the livery stable, on the night of June 5, 1881, and saw the trouble between the witness Forrester and the two men, O'Brien and the defendant. Witness knew O'Brien and the defendant; they worked at Thompson's theatre, and witness recognized them that night. Witness did not hear what they said to Forrester, but heard the latter calling for help. After the struggle was over, the defendant and O'Brien went away, and Forrester came and asked witness to come and help him; to which request the witness replied that he could not leave his team. Forrester said they had tried to rob him. After the witness put up his horses he went up in the city, found a policeman, and pointed out the defendant and O'Brien, and had them arrested. This was about half an hour after the trouble occurred. The moon was shining when the difficulty took place.

Cross-examined, the witness could not say whether or not the parties tried to rob Forrester, but they were scuffling on the street. Nor was he positive that it was Forrester who called for help, but supposed so because it was he who came across the street and asked witness for help immediately after the struggle. Witness could not state what was the condition of the parties at the time, but when he pointed the defendant out to the officers he seemed to be pretty drunk.

For the defense, J. W. Thompson testified that the

defendant, when arrested, was a regular employee at witness's theatre.   At half past twelve in the night of June 5, 1881, when the performance closed, the defendant was very drunk.

C. Dempsey, a night watchman, testified that he arrested the defendant on Main street about half past two in the morning of June 6, 1881.   Defendant was very drunk at the time, and did not know what he was talking about.   Witness had to assist him on the way to the calaboose, to keep him from falling.   After getting there he fell into a stupor.   When Forrester came to the calaboose he did not recognize the defendant as one of his assailants.

W. Ramsey, also a night watchman, testified that defendant, when arrested, seemed to be drunk.   At the calaboose he was like a dishrag, and witness suggested that he be held up and dropped on his face; which was done, and defendant put up his hands to catch.   On cross-examination, the witness said his suggestion was for the purpose of seeing whether the defendant was really drunk or playing drunk; and witness repeated that the defendant, when dropped, caught on his hands.

Two employees at the theater testified that defendant was very drunk there at midnight of the date alleged.

Marshal Morton, for the defense, testified that Forrester, when he came to the calaboose to identify the arrested parties, described the affray to witness, and said, "When one of the men asked me what time it was and I answered, one of them ran upon and seized me. I knocked him loose from me and nearly down, and then both of them attacked me."   Witness stated that the defendant, when put in the calaboose, was very drunk, and for some time afterwards was in a stupor.

In rebuttal, the State recalled Ramsey, who testified that Forrester, when he came to the calaboose, did recognize both the defendant and O'Brien as the men who attacked him.

*Crawford & Smith, W. B. Gano,* and *J. H. Skiles,* for the appellant. The indictment charged two offenses, a felony and a misdemeanor. The specific fraudulent intent to take Forrester's property and appropriate it to the use of the defendant was the gist of the first or felonious offense, and a simple intent to injure, coupled with an ability, the gist of the misdemeanor. Attention should have been given to this distinction, and it was error to charge that the defendant must be so drunk that he did not know what he was doing. If the mind was so beclouded with whisky that it was probable that he was unable to and did not entertain the specific intent to rob, this would be sufficient to acquit him of the felony, although he might have known that he was aiding in making an assault on Forrester.

It will be noticed that the court submits the same instruction on drunkenness, or, in other words, submits to the jury but one instruction on drunkenness, as applied to both phases of the case, the felony and the misdemeanor, and the criterion is, that " he did not know what he was doing." Intoxication is no defense to a criminal charge where the offense charged consists merely in doing a criminal act without regarding intention. This court, in *McCarty* v. *State,* says: " If the defendant was so drunk, at the time he shot the deceased, that he did not know what he was doing, certainly the killing of the old man under the facts in this case would not be less than murder in the second degree." 4 Texas Ct. App. 470.

Before this, the Supreme Court, though discussing a murder case, had stated the general rule applicable to all cases of intent, as follows: " But in the class of offenses in which criminality depends solely, or to a certain degree, upon the state or condition of the mind at the time the wrongful act is done, evidence of the state and condition of the mind, showing *ability* or *inability of the mind* to *form* and *entertain a sedate* and *ordinate* criminal design

is certainly of most vital importance." *Ferrell* v. *State*, 43 Texas, 508.

In *Loza* v. *State*, 1 Texas Ct. App. 488, this court approves this, and in this case evidently Loza knew what he was doing; his mind had not reached that point of mental imbecility indicated in the charge here complained of. His mind in respect to the trespass in taking the horse was sufficiently balanced to distinguish right from wrong; but was it in a condition to entertain the fraudulent intent to take, and apply permanently to his own use, the property of another? And the court say, quoting from Bishop: "We have seen that there are offenses which, from their peculiar nature, are committed only when the act is joined to the particular intent. Here, manifestly, if without the intent one by drink makes himself incapable of *entertaining* the intent, and so does the act, but never, then or afterwards, yields it the sanction of his will, he does not commit the particular offense; one ingredient in which is wanting, whatever other criminal responsibility he may incur." The capacity to form and entertain a specific fraudulent intent is the criterion here, and in every like case.

Must a man be so drunk that he did not know what he was doing before his mind can be said to have reached a point of inability to form and entertain an "ordinate criminal design," such as the law requires to exist to constitute the felony with which the defendant was charged? We think not. Of course, if one is so drunk as not to know what he is doing he can not have sufficient mental capacity to form an intent of any kind — not even the virtuous intent to "never get drunk any more." The power to reflect and distinguish right from wrong ought to be present in every mind where the existence of a certain intent is essential to and must accompany certain acts, to constitute crime.

If, in any given case, where the existence of a certain

Argument for the appellant.

intent is necessary to constitute crime, the mind of the accused was in such condition that he did not know what he was doing, or if he *did* know what he was doing but did not know that it was wrong, or was incapable of forming and entertaining the necessary design, then he ought not to be convicted; not because any degree of drunkenness will excuse or justify a criminal or wrongful act, but because the alleged offense involves a certain intent, and because the defendant by reason of the drunkenness was incapable of forming and entertaining that necessary intent. Drunkenness affects men in such different ways and degrees that, as a question of law, no criterion can or ought to be, established beyond the simple inquiry, was the mind of the defendant, at the time of the commission of the alleged acts, sufficiently clear to understand and to form and entertain the necessary criminal design or intent? If it was not, he ought not to be convicted of an offense of which a certain design or intent was a necessary component, although he might be convicted of any other offense involved in the charge where a specific design or intent was unnecessary; and against this consequence no condition which was the result of drunkenness would excuse him.

And so in this charge of assault with intent to rob, if the accused was proven so drunk as to be incapable of forming and entertaining the fraudulent intent to take Forrester's goods and to appropriate them to his own use, then he could not be convicted of the felony, though no amount of drunkenness would excuse him from the consequences of an assault and battery. But the charge of the court makes his liability to punishment for the felony as well as the misdemeanor depend upon the same condition, and that was that "he did not know what he was doing, and was unable to form the criminal intent necessary to commit the crime charged." What crime? The felony or misdemeanor? The assault with *intent* to rob, or the assault and battery?

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J.   The appellant was convicted for an assault
with intent to rob.   There was evidence tending to show
that Scott was drunk at the time of the assault.

Upon this subject the court below charged as follows:
"Voluntary drunkenness furnishes no excuse or justifi-
cation for crime.   However, if you find that defendant
did make the assault as charged in the indictment, and if
you find that, when he so made said assault, he was so
drunk that he did not know what he was doing, and was
unable to form the criminal intent necessary to commit
the crime charged, then you will acquit him.   But any
amount of voluntary drunkenness, which does not reach
the *status* above indicated, would not furnish any excuse
or justification for the commission of it."

The learned counsel for appellant, in the brief and ar-
gument, insists that this charge is not the law, and that
therefore the judgment should be reversed.   We listened
with attention and great pleasure to the argument of
counsel for defendant, but are forced to the conclusion
that this charge is not obnoxious to the objections urged
against it.

The main attack is made upon this part of the charge,
"If you find that, when he so made the assault, he was
so drunk that he did not know what he was doing."   This,
we think, is correct; for, if he knew what he was doing,
he knew that he was trying to rob (the converse of the
proposition), and in law and in morals he should be held
culpable.   But this part of the charge should not be de-
tached from that which is directly connected with it.   It
proceeds, "and was unable to form the criminal intent
necessary to commit the *crime* charged, then you will
acquit him."   The court below admitted evidence of
drunkenness, and applied the true principles of law
thereto, by instructing the jury in effect that drunkenness
could be looked to in passing upon the ability to form the

*criminal intent.* For this purpose, and this alone, can drunkenness be shown in a case like this.

Drunkenness can be looked to in passing upon the *status* of mind, in murder trials. Where the question is whether the mind was sufficiently calm and sedate to form the desire to kill, and to properly comprehend the consequences of the act; the *status* of the mind being the test by which the character of homicide is determined, whether murder of the first or second degree. We are not aware of any case decided by *our* appellate courts in which it is held that drunkenness will excuse or justify crime. To thus hold would be a solecism; for, if in fact a crime is committed, we are not aware of any fact which can excuse or justify its commission. The law knows no excuse or justification of crime. If the acts which constitute the crime are excused or justified by law, they are not criminal. Whilst drunkenness can not excuse or justify crime, it however may be shown in order to determine whether any crime, or a particular crime, has been committed at all; but, if committed, though the party be ever so drunk, there can in the very nature of things be no excuse or justification.

We have examined all of the other errors complained of, but find no errors in fact,— that is, such error, over which we have revisory power, as will require a reversal of the judgment of the court below. The judgment is affirmed.

*Affirmed.*